Steven Glenn OTTEM, by Carrie C. OTTEM, his Guardian Ad Litem and his wife, and Carrie Ottem, individually, Plaintiffs,

v.

UNITED STATES of America, Defendant and Third Party Plaintiff,

v.

Everett A. PETERSON and Red Wing Shoe Company, Third Party Defendants.

Civ. No. 4–82–1354.

United States District Court, D. Minnesota, Fourth Division.

Aug. 17, 1984.

Robert W. Gislason and Peter Bolgna, Gislason & Martin, P.A., Edina, Minn., for plaintiffs.

Robert M. Small, Asst. U.S. Atty., Minneapolis, Minn., for defendant and third party plaintiff.

## MEMORANDUM OPINION AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiffs Steven Glenn Ottem and Carrie Ottem seek damages from the United States of America (government)[1] under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. The action arises out of a motor vehicle accident in which plaintiff Steven G. Ottem suffered severe personal injuries. The matter was tried before this court for five days. The court,

---

1. The government brought a third-party action against Everett A. Peterson and Red Wing Shoe Company. Both third party defendants were dismissed just prior to trial pursuant to stipulations entered into between the parties. Third party defendant Everett Peterson entered into a settlement agreement with the plaintiffs under the terms and conditions of an executed Pierringer Release. See *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn.1978).

now having considered the evidence produced at trial, having observed the demeanor of the witnesses and considered their credibility, and having reviewed the post trial memoranda of the parties, hereby enters its findings of fact and conclusions of law in memorandum form pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. The Accident and the Parties

The accident which resulted in Steven Ottem's injuries occurred in Red Wing, Minnesota at about 12:45 p.m. on Friday, October 5, 1979. The accident involved an automobile owned and operated by Chester Freer Thompson, a station wagon owned and operated by Everett Peterson, and a motorcycle owned and operated by Steven Ottem. Mark Wipperling was a passenger on Ottem's motorcycle.

At the time of the accident, Thompson was 71 years old and a part-time employee of the United States Department of Agriculture. Although Thompson had formally retired after working for the Department of Agriculture since 1954 and had begun receiving his pension, he continued to perform work for the Department on a part-time basis. On the day of the accident, Thompson was directed by his supervisor to drive to Red Wing for the purpose of directing and supervising the denaturing and labeling of a large quantity of dry milk powder at a Ralston-Purina Warehouse. Thompson was paid for an eight-hour tour of duty.

Because there was no place to eat at the warehouse, Thompson arranged to have lunch at a nearby restaurant with Daniel Jarl, one of the men Thompson was supervising at the warehouse. During the lunch, Thompson and Jarl discussed the logistics for completing the afternoon's work. The accident occurred as Thompson was returning to the warehouse after lunch.

The point of impact was in the eastbound lane of a divided highway (Highway #61) at its intersection with Carol Lane. The

highway's posted speed limit was 50 miles per hour. Peterson was proceeding in an easterly direction on the highway at approximately 50 miles per hour. Ottem and his passenger were driving behind Peterson. The weather was clear, and the highway was in good condition. There were no obstructions to vision in either direction on the highway for a distance of about one-half mile.

As Peterson and Ottem approached the intersection, Thompson was stopped in his automobile facing north on Carol Lane. When Peterson was less than 300 feet from the intersection, Thompson suddenly started forward. Peterson thought that Thompson was going to turn right onto the highway. He removed his foot from the accelerator and moved to the far left lane to provide room for Thompson to turn onto the highway. Despite the oncoming traffic, however, Thompson proceeded across the highway. Peterson applied his brakes. His vehicle left skid marks on the highway surface which were approximately 67.4 feet long. Peterson struck Thompson's vehicle in the left front quarter panel.

Ottem was following Peterson at a distance of four to five car lengths. Wipperling saw Thompson pulling out and nudged Ottem who was glancing to his left. Ottem applied his brakes, but the left motorcycle peg[2] glanced off the right side of Peterson's station wagon. The motorcycle tipped and went on to strike the left side of Thompson's automobile in the area of the door post between the front and rear doors.

At the time of the accident, Steven Ottem was nineteen years old and in excellent health. The accident resulted in severe head injuries, including multiple depressed skull fractures. He injured the higher center of the brain which is responsible for most thought processes and for coordination.

Ottem was initially taken to St. John's Hospital in Red Wing, but he was immediately transferred to St. Mary's Hospital in

2. The evidence indicates that Ottem's cycle was equipped with highway pegs in addition to standard foot rests. Highway pegs provide a special foot rest while riding long distances.

Rochester, Minnesota, due to the severity of his injuries. When he arrived at St. Mary's, Ottem was in a complete coma. During the next four weeks Ottem slowly regained consciousness, but for the most part remained unresponsive.

Ottem was returned to St. John's on November 14, 1979 and began making a limited recovery. In January, 1980, he was transferred to the Sister Kenny Institute of Abbott-Northwestern Hospital in Minneapolis to receive rehabilitation services. He was able to make sounds of moaning and crying, but was unable to verbalize. He exhibited random movements of all four extremeties. He was able to follow some simple commands, but he did not appear to consistently recognize his family.

While at Sister Kenny Institute, Ottem's recovery progressed somewhat after undergoing intensive courses of physical and occupational therapy, as well as psychological evaluation. His balance improved, and he was able to walk with assistance, as well as propel himself in a wheelchair. He was also able to feed himself with assistance. His responsiveness, however, still remained sporadic. Although he appeared to comprehend some of what was said to him, he was unable to speak. While at the Sister Kenny Institute, Ottem cried for prolonged periods of time, especially after family members had left.

Ottem was transferred to the Red Wing Nursing Home in May, 1980, where he continues to be a patient. He has partial paralysis and requires the use of a wheelchair although he can walk some with assistance. He is unable to talk and very limited in his capacity for any type of nonverbal communication. He appears unable to synthesize new information. His left eye is permanently deviated downward resulting in impaired vision. All of Ottem's injuries are permanent, and he will require 24 hour nursing care for the remainder of his life.

Steven and Carrie Ottem were married approximately six weeks prior to the accident. They had a very close relationship and spent the majority of their time together. After the accident and while Steven was a patient at St. Mary's Hospital, Carrie spent every day at the hospital. She continued to visit him 2–3 times a week while he was at the Sister Kenny Institute in Minneapolis and eventually began taking him home on weekends. At the present time, Carrie visits Steven regularly at the nursing home during the week and takes him home or to his parents' house on the weekends.

As a result of the accident, Steven Ottem has been unable, and will continue to be unable, to engage in almost all recreational, marital, and family activities. Carrie Ottem has been and will continue to be deprived of his services and companionship in any type of normal relationship.

Because of his injuries, Ottem will be unable to carry on any gainful employment. At the time of his accident, Ottem was employed in the welt department of the Red Wing Shoe Company's shoe factory earning an hourly wage of approximately $6.87. He was considered a good worker. His father has made a career of the shoe company, and the record suggests that Steven would have too.

Ottem was not wearing a protective helmet at the time of the accident. The evidence indicates that a helmet would have reduced his injuries by 25%. However, the expert testimony also indicates that even if he had been wearing a helmet, the accident still would have left him permanently and totally disabled. This is another indication of how severely he was injured.

Pursuant to the Federal Tort Claims Act, plaintiffs' counsel filed a Notice of Claim with the U.S. Department of Agriculture. Plaintiffs' counsel intended to file the claim on behalf of both Steven Ottem and his wife Carrie, but failed to submit a separate administrative claim for loss of consortium on behalf of Carrie. After filing the claim, plaintiffs' counsel contacted the government attorney assigned to the case and was assured that the claim satisfied the necessary jurisdictional requirements. Plaintiffs' counsel had in excess of five telephone conversations with the government's

attorney during which Carrie Ottem's claim for loss of consortium was discussed.

## II. Jurisdiction

Defendant contends that because Carrie Ottem did not file the required administrative claim with the appropriate agency, this court is without jurisdiction to hear her claim.

There is no firmly established case law regarding the enforcement of the technical and procedural requirements concerning jurisdiction under the Federal Tort Claims Act. While some courts have required strict compliance, other courts have been more sensitive to the facts of each case and the equities involved. One key factor is whether the government was provided adequate notice of the claim so as not to impede potential settlement. *See, e.g., Champagne v. United States*, 573 F.Supp. 488 (E.D.La.1983); *Locke v. United States*, 351 F.Supp. 185 (1972).

■ The affidavit of plaintiffs' counsel indicates that the government was provided adequate notice of Carrie Ottem's claim for loss of consortium. The affidavit states that plaintiffs' counsel had in excess of five telephone conferences with the government's attorney during which there were discussions of Carrie Ottem's claim. The government does not dispute this fact. The government apparently investigated, processed, and denied the claim without once mentioning any defect or omission. The government has shown no prejudice, and the policy favoring settlement has not been deterred. Under these circumstances, the remedial purpose of the Federal Tort Claims Act is best served by permitting Carrie Ottem's claim.

## III. Liability

The Federal Tort Claims Act provides that the liability of the United States shall be determined by the law of the place where the act or omission occurs. 28 U.S.C. § 1346(b); *see Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Because the alleged negligence and

injury in this case occurred in Minnesota, Minnesota law governs. *See Loge v. United States*, 662 F.2d 1268 (8th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982).

■ Under Minnesota law, an employee's negligent act may be found to have occurred within the scope of his or her employment if the conduct furthered the interests of the employer. *Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11 (Minn. 1979). It is not necessary that the conduct be for the sole purpose of benefiting the employer. *Laurie v. Mueller*, 248 Minn. 1, 78 N.W.2d 434 (1956).

> The law is clear that unless an employee totally deviates from his employment for purposes that are entirely personal, performance of a function within the scope of employment for personal purposes does not destroy the agency relationship insofar as the employer's vicarious liability may be concerned ....

*Reliance Insurance Company v. Stack*, 289 N.W.2d 71 (Minn.1979).

■ There is no dispute that Thompson's only purpose for traveling to Red Wing on the day of the accident was to perform services for the Department of Agriculture. There is also no dispute that he was authorized and directed to use his personal automobile to travel to Red Wing. Finally, there is no dispute that the purpose of Thompson's lunch, in addition to eating, was to discuss the afternoon's work with a worker he was supervising. Thompson's lunch, as well as the drive to and from the restaurant, was at least in part in furtherance of the interests of his employer and thus within the scope of his employment. Accordingly, the United States may be held vicariously liable for Thompson's negligence.

The remaining issue of liability is whether Thompson's negligence was the sole proximate cause of the accident and Steven Ottem's injuries.[3] The court finds that his negligence was the sole cause of the accident and predominantly responsible for Ottem's injuries.

---

**3.** The government admits that Thompson was negligent in the operation of his vehicle.

■ The evidence indicates that Ottem was operating his vehicle properly. Ottem was following Peterson at a distance, which the court finds to be reasonable under the circumstances, of four to five car lengths. There is no evidence indicating that his feet were on the motorcycle's highway pegs at the time of the accident. Ottem applied his brakes promptly after Thompson moved out in front of the oncoming traffic of the highway. The court finds that Ottem was not negligent in operating his vehicle.

■ The evidence indicates that Ottem's negligent failure to wear a helmet added to his injuries but that he would have been permanently and totally disabled by the accident even if he had worn one. Thus, his damages for lost wages and benefits and past and future medical care result from Thompson's negligence alone. The court finds, however, that the damages for pain and suffering should be reduced to reflect his proportionate fault. *See* Minn. Stat. § 604.01.[4]

■ The evidence also indicates that Peterson operated his vehicle in a reasonable manner. Peterson testified that he had driven on Highway # 61 for many years and that he frequently had seen cars make a right turn from Carol Lane onto the highway in front of oncoming traffic. Consequently, when Peterson first noticed Thompson start into the intersection, Peterson thought that Thompson was going to turn right and proceed into the right lane of the highway. Peterson took his foot off the accelerator and moved into the left lane to provide sufficient room for Thompson. As soon as Peterson realized that Thompson intended to proceed across the intersection, Peterson forcefully applied his brakes. Under the circumstances, the court finds Peterson's actions reasonable and finds no basis for concluding that he was negligent.

## IV. Damages

The plaintiffs and defendant generally agree on the proper valuation of Steven Ottem's past special damages. The evidence indicates that Steven Ottem has incurred past special damages of $251,388.69. This includes $175,168.24 in past medical expenses, $65,153.74 in past loss of earnings, and $11,066.71 in past loss of fringe benefits.

There is substantial disagreement between the parties, however, concerning the proper valuation of Steven Ottem's future economic losses. These losses include future medical expenses and the loss of future earnings and fringe benefits.

Plaintiffs' expert, Robert Rolschau, testified that the present value of Ottem's future loss of earnings is between $609,-923.53 and $660,162.86 and that the present value of Ottem's future loss of pension benefits is between $79,192.18 and $799,-897.85. Rolschau's estimates did not include the present value of Ottem's future loss of other fringe benefits, such as medical, dental, life and disability insurance. He also did not take into consideration the personal income taxes Ottem would have incurred annually. Rolschau assumed that Ottem would have continued working until age 65 and that his wages would have increased at a rate equivalent to the average rate of increase in the cost of living index over the last 17 years. Rolschau discounted Ottem's future losses at a rate equal to the average rate of return on three month treasury bills over the last 17 years.

Defendant's expert, Dr. Raymond Schultz, testified that the present value of Ottem's future loss of employment income after considering taxes is $308,000.00. Schultz testified that Ottem would have received fringe benefits equal to 14% of his base pay, but that he would have paid taxes at a rate of approximately 15% per year. Schultz assumed that Ottem would have worked only an additional 33.1 years due to loss of work time resulting from unemployment, injuries, etc. Schultz also assumed that Ottem's wages would increase at a rate of approximately 7% per year, which was the historical average annual wage increase for the shoe industry,

---

4. The government concedes that Ottem's fault in failing to wear a helmet should only be applied to this element of damages. See paragraph 52 of its proposed findings.

and that the proper discount rate was 11.5%, which was the current effective yield for a 30 year bond at the time of trial.

The evidence indicates that Ottem would have had the opportunity to work for Red Wing Shoe until he retired. Ottem had begun working there in July, 1978 and had never missed a day of work. He was considered an excellent employee, and it was likely that he would have had opportunity to progress into more skilled jobs. Ottem's father had worked for Red Wing Shoe his entire life. Given these facts, the court finds that Ottem would likely have continued working until age 65 and therefore rejects Shultz's estimate of a reduced work expectancy.

Although the court agrees with plaintiffs as to Ottem's work expectancy, it finds Rolschau's reliance on the rate of return on three month treasury bills for the discount rate to be unnecessarily conservative. Schultz's estimate of the discount rate appears more reasonable. Much of the money needed to compensate Ottem for his future losses will not be required immediately and therefore may be invested prudently in long term investments. Schultz's estimate of Ottem's future wage increases also seems more reasonable since it was based on data specific to the shoe industry.

■ Both plaintiffs and defendant apparently agree that Ottem's base salary was $17,846. The court finds that Ottem would have continued working for an additional 41 years from the time of trial, that his wages would have increased at a rate of 7% per year over that period, and that the proper discount rate, based on the rate of return on a reasonable investment, is 11.5%. Accordingly, after compounding Ottem's base salary at a rate of 7% for 41 years and discounting at a rate of 11.5%, the court finds that a sum of $336,534.19 will reasonably compensate Steven Ottem for the loss of his future employment income. This figure excludes the value of the fringe benefits Ottem would have received as an offset against the taxes he would have incurred annually.

Plaintiffs' expert, Professor Roger Feldman, testified that the present value of Ottem's future medical expenses could vary between $6 and $10 million, depending on future inflation rates. Feldman's estimate was based on his research into the historical relationship between the national rate of inflation, the Minneapolis rate of inflation, the rate of increase in nursing home costs, and the rate of interest on six month treasury bills. Feldman testified that, assuming a national inflation rate of between 1% and 12%, the rate of increase in nursing home costs would exceed the rate of return on 6 month treasury bills by between 5.23% and 6.49%. Feldman testified that the difference between the rate of increase in nursing home costs and the rate of return on six month treasury bills increased as the national inflation rate increased. Feldman's estimate therefore assumed a negative discount rate of between 5.23% and 6.49%. Feldman's estimate further assumed that Ottem had a normal life expectancy and that he would live an additional fifty years.

Schultz testified that the present value of Ottem's future medical expenses was approximately $595,000.00. His estimate was based on the price of a lifetime annuity that could be purchased at the time of trial from a major insurance company. Schultz testified that the annuity would pay $29,000 the first year and that the amount paid each additional year would increase at the rate of 10% for the remainder of Ottem's life. The insurance companies from which Schultz obtained his estimates apparently assumed that Ottem's remaining life expectancy was approximately 22 years. Schultz also testified that nursing home costs have increased at a rate of 10.5% over the last 20–25 years.

Again the court finds neither party's estimate completely persuasive. Schultz did not produce documentation of the insurance quotations upon which he relied or provide a full explanation of the requirements and restrictions of such an annuity agreement. The court is therefore unable to determine the adequacy of this proposed program. Feldman's estimates on the other hand assume that the rate of increase in nursing home costs will exceed the rate of return on a reasonable investment by ap-

proximately 6% for the next 50 years. As noted previously, the court finds plaintiffs' use of the rate of return on short term treasury bills to be an unnecessarily conservative investment strategy. Furthermore, the court is not persuaded that the relationship Dr. Feldman has found between the rate of inflation and the rate of increase in nursing home costs will remain constant.

The court finds that Ottem should have a normal life expectancy of an additional 50 years. Although defendant's expert, Dr. Zarling, testified that Ottem's life expectancy might be reduced due to urinary tract infections,[5] Ottem's attending physician, Dr. Kanter, testified that Ottem's urinary tract infections had been treated successfully and that he believed that Ottem would have normal life expectancy. Given the fact that Ottem's medical expenses for the current calendar year are $29,342, and that his remaining life expectancy is 50 years, the court finds that the sum of $1,158,991.20 will reasonably compensate Ottem for his future medical expenses. This figure has been calculated by compounding Ottem's current medical costs at a rate of 10.5% for 50 years and then discounting at a rate of 11.5% to arrive at the present cash value.

Because of the severity of the injuries suffered by Steven Ottem and his continuing disability, he has experienced past pain and suffering and will continue to do so in the future. The court assesses his damages for past pain and suffering at $400,000 and for future pain and suffering at $600,000. Since Ottem's negligent failure to wear a helmet is responsible for 25% of his injuries, these damages should be reduced accordingly. Thus, he is awarded $300,000 for past pain and suffering and $450,000 for future pain and suffering.

Carrie and Steven Ottem had been married only six weeks at the time of the accident. Carrie Ottem has been deprived of Steven's services and companionship, and she will continue to be in the future.

The court finds that she should be awarded $100,000 to compensate her for her loss of services and consortium.

### ORDER

Accordingly, based on the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that:

1. Defendant's motion to dismiss Carrie Ottem is denied.

2. Steven Glenn Ottem is entitled to judgment against the defendant United States of America in the amount of $2,496,914.08.

3. Carrie Ottem is entitled to judgment against the defendant United States of America in the amount of $100,000.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

5. Dr. Zarling's testimony was apparently based on his belief that Ottem would be confined to a wheelchair. However, the evidence indicates that Ottem is able to walk with assistance and that walking is likely to reduce significantly the likelihood of urinary tract infections.