**Louis H. MANKO,**
**Appellee/Cross-Appellant,**

v.

**UNITED STATES of America,**
**Appellant/Cross-Appellee.**

**Nos. 86-1933, 86-2114.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1987.

Decided Sept. 25, 1987.

Rehearing and Rehearing En Banc
Denied Dec. 10, 1987.

**834**

Jeffrey Axelrad, U.S. Dept. of Justice, Washington, D.C., for appellant/cross-appellee.

Charles M. Thomas, Kansas City, Mo., for appellee/cross-appellant.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

ARNOLD, Circuit Judge.

This is an action brought by Louis H. Manko against the United States under the Swine Flu Act of 1976, Pub.L. 94–380, 90 Stat. 1113, originally codified as 42 U.S.C. § 247b(j) *et seq.*[1] The Swine Flu Act established a national program of immunization for a disease popularly known as swine flu. In order to induce private companies to manufacture the needed vaccine, the United States stepped into the shoes of the manufacturer, so to speak, and assumed all liability for damages, incorporating as a remedy the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b). See 42 U.S.C.A. § 247b(k)(2)(A). Instead of suing a drug company, a recipient of the vaccine claiming to have been injured would sue the United States.

The plaintiff received his vaccination on October 20, 1976. He began feeling ill about ten days later. (We recite the facts in the light most favorable to the plaintiff, who won in the District Court.) Plaintiff's condition worsened, and on January 15, 1977, he was diagnosed as having Guillain-Barré Syndrome (GBS), a paralytic disease known to result from swine-flu vaccinations in a very small number of cases. In this action, plaintiff claims that his GBS, from which he has only partially recovered, did in fact result from the vaccination. As the case was tried in the District Court, the only issue as to liability was the question of causation: was Mr. Manko's GBS caused by the vaccination, or did it result, as the government contends, from a viral illness wholly unrelated to the vaccination? The District Court[2] found the facts for the plaintiff, 636 F.Supp. 1419 (W.D.Mo.1986), and the United States appeals. Plaintiff cross-appeals, claiming that the damages (the District Court awarded $1,171,442.01) were inadequate in one respect. Also before us is the appeal of Sylvia Manko, plaintiff's wife, who claims that she should have been allowed to intervene to assert a claim for loss of consortium.

We affirm the judgment of the District Court in all respects, subject to a remand to that Court on one relatively small aspect of the award of damages.

I.

On the main appeal, the government spends a good deal of time arguing that the District Court erred in imposing certain sanctions on it in connection with what the Court held to be an unjustified failure on the part of the United States to comply with a discovery order. The government argues, in brief, that the District Court's action was inconsistent with an order entered at an earlier stage of the litigation by the United States District Court for the District of Columbia, to which this action, along with many others, had been transferred for pretrial proceedings under 28 U.S.C. § 1407, the statute establishing special procedures for multidistrict litigation. The effect of the District Court's action was to preclude the government from contesting certain assertions of fact made by plaintiff in connection with records of other people's

---

1. The statute was repealed by Pub.L. 95–626, § 202, 92 Stat. 3574 (1978), 42 U.S.C. § 247b (1978).

2. The Hon. D. Brook Bartlett, United States District Judge for the Western District of Missouri.

claims under the Act—records the government claimed it did not have to produce. This order of preclusion, the government contends, crippled its entire factual defense. A new trial should therefore be ordered. The plaintiff replies that the District of Columbia order is not inconsistent with the later action of the trial court, and that, in any event, the trial court was not bound by the previous order of the transferee forum.

We find it unnecessary to resolve this dispute. The plaintiff's contention that his GBS was caused by the vaccination was supported by three separate and distinct lines of proof. The District Court described these three factual approaches as follows:

> Plaintiff argues that the evidence presented at trial establishes that plaintiff's GBS was a reasonable and probable consequence of plaintiff's swine flu vaccination because:
>
> a) plaintiff demonstrated GBS symptoms in the fall of 1976 shortly after plaintiff received the swine flu vaccination and these symptoms smoldered until early January 1977, when plaintiff became acutely ill; or
>
> b) even if the symptoms of plaintiff's GBS were first manifested in early January 1977, there is a causal relationship between plaintiff's GBS and the swine flu vaccination based on a proper epidemiological analysis of available data; or
>
> c) based on cases that were deemed long onset cases of GBS pursuant to discovery sanctions imposed in the Court's November 29, 1983, Order, there is a causal relationship between plaintiff's GBS and his swine flu vaccination regardless of whether plaintiff's analytical approach or defendant's analytical approach is used.

636 F.Supp. at 1427.

The District Court found for the plaintiff on each of these three theories. In particular, it found that plaintiff in fact developed GBS within three weeks of the vaccination, and that the disease "smoldered" for a while before breaking out in full force in January of 1977. This finding was made after a careful, comprehensive, and thorough review of the plaintiff's own testimony, medical records, and expert opinions. Having reviewed the record with the care commensurate to the subject-matter and importance of this case, we hold that this finding is not clearly erroneous. We are therefore bound by it. The discovery dispute briefed by the parties—the dispute that ultimately led to the sanctions we have alluded to—had nothing to do with this branch of the case. The District Court's finding in favor of plaintiff's "smoldering" theory does not depend at all on the preclusion order of which the government complains, and that finding would remain good even if we agreed with the government's argument that the District Court abused its discretion in this matter of discovery. The "smoldering" theory is an adequate and independent ground for the Court's finding on the issue of causation, and the finding in favor of that theory is affirmed.[3] The liability of the United States, then, is established, and we pass to other issues.

## II.

■ The United States urges error in the computation of damages in a number of respects: it says that the judgment should have been reduced to take account of the fact that plaintiff would have owed income tax on his earnings had he continued to work (a portion of plaintiff's award was for lost earnings); that Medicare and social-security benefits should have been offset against Manko's damages; and that the inclusion in the judgment of income that would have been earned on pension benefits that would have accrued had Manko

---

**3.** The discovery issue argued by the government would affect the finding on plaintiff's third theory, a theory based on inferences from so-called long-onset cases of GBS. The government argues, mainly on the basis of a footnote in the trial court's opinion, 636 F.Supp. at 1434–35 n. 6, that the alleged discovery error also affected the finding on plaintiff's second theory. We are inclined to disagree, but even if the government is right on this score, the first theory, based on the historical facts of plaintiff's own individual case, rather than on statistical or epidemiological inferences, still stands on its own.

continued to work violated the prohibition on the award of prejudgment interest in Federal Tort Claims Act cases. We address each of these arguments in turn.[4]

## A.

A large portion of the judgment—$576,664—represented lost income—money that Mr. Manko would have earned in salary between 1977 and 1982, the period between the onset of his GBS-caused disability and the time when he would have retired in the normal course of events. Some income tax would of course have been due on these earnings. The United States claims that failure to reduce the award by the amount of plaintiff's putative tax liability amounts to an award of punitive damages, which is forbidden in Federal Tort Claims Act cases by 28 U.S.C. § 2674. One circuit has so held. *Hollinger v. United States*, 651 F.2d 636, 642 (9th Cir.1981).

The Tort Claims Act incorporates, as the substantive standard to be applied, the law of the state in which the tort was committed, in this case Missouri. Under Missouri law, damages awards for lost income are not reduced for taxes. *Dempsey v. Thompson*, 363 Mo. 339, 251 S.W.2d 42, 45 (1952). This is one of the rules for determining compensation in tort cases. There is nothing inevitable about it, and a good argument can be made that it is unfair to defendants, but it is the law of Missouri, and we must therefore apply it in this Federal Tort Claims Act case unless to do so would amount to an award of "punitive damages" within the meaning of that statute. We agree with the plaintiff that such a holding would "require[ ] a broad and unprincipled definition of the term 'punitive damages.'" Brief of Appellee/Cross-Appellant 41.

Whether to deduct income taxes is simply one of many issues courts face in deciding what is fair compensation for an injury. Other such issues are whether to apply the collateral-source rule, whether to award prejudgment interest, how certain a forecast of future earnings must be, how to value pain and suffering, and so forth. Different jurisdictions resolve these issues in different ways, but they have nothing to do with "punitive damages" as that term is traditionally used in the law. They do not depend on a finding of wanton or malicious conduct, they are not imposed to punish a defendant, and they have nothing to do with a defendant's net worth—all questions that customarily arise when punitive damages are sought or awarded. We conclude that Congress did not mean to outlaw all variations from some ideal norm of compensation when it forbade "punitive damages." It was referring only to that concept in its traditional sense. It was not error for the District Court to follow Missouri law on the proper treatment of tax liability on hypothetical lost earnings.

## B.

In calculating Manko's past and future medical expenses, the District Court refused to subtract sums which he had received as Medicare benefits. 636 F.Supp. at 1449–51. Similarly, in assessing lost earnings, the Court refused to deduct amounts received as social-security benefits. *Id.* at 1451 & n. 44. The government claims that these amounts should have been offset against some of Manko's damages because they were, in effect, payments from the United States made on account of Manko's illness and should, therefore, be credited to the government. The District Court rejected the claim, holding that, under Missouri law, the Medicare and social-security programs were collateral sources because Manko had made contributions to them, so the government should not receive a credit against its damages liability for those payments. *Id.* at 1450–51.

We agree with the District Court. This issue is controlled by *Overton v. United States*, 619 F.2d 1299, 1305–09 (8th Cir.

---

4. The United States also claims that it was error to award $13,864.50 for medically recommended travel. The District Court found that this expense (considerably less than the plaintiff claimed) "was a reasonable and necessary medical expense directly attributable to plaintiff's GBS." 636 F.Supp. at 1445 (footnote omitted). This finding is not clearly erroneous.

1980). There we held that according to Missouri law a payment comes from a collateral source if "the payment in question came from a source wholly independent of the liable party or when the plaintiff may be said to have contracted for the prospect of 'double recovery.'" *Id.* at 1307. In *Overton,* the question was whether Medicare payments were from a collateral source, and we held that they were not because the plaintiff had never contributed to the Medicare program. Here, by contrast, that factual predicate is satisfied; the District Court found that Manko had paid into each of the federal programs from which he received benefits. 636 F.Supp. at 1451. Thus Manko can be said to have contracted for this recovery, and the Court's ruling was correct. See 619 F.2d at 1307–09.

## C.

■ The District Court also awarded Manko a total of $14,151 to compensate for the loss of money that his pension plan would have earned from 1977 through 1985, and which would have increased the amount of his pension benefits. 636 F.Supp. at 1447–49 & nn. 27–37. The government claims that this is prejudgment interest on the employer pension contributions Manko lost by virtue of his illness, and, as such, cannot be recovered in a Federal Tort Claims action. See 28 U.S.C. § 2674. There is no dispute over whether Manko's employer would have contributed to the pension plan if Manko had continued working; nor is there a dispute over the amount that would have been contributed or the rates of return of the plan from June 1976 through 1985. See 636 F.Supp. at 1448 nn. 29–31. The only issue, therefore, is whether the lost pension earnings represent "interest prior to judgment" under 28 U.S.C. § 2674.

Since the award of lost pension earnings here covers the time before judgment, the government argues that the award is, literally, "interest prior to judgment." We disagree with this characterization. Prejudgment interest is normally taken to refer to an award imposed by law to compensate

someone for the loss of use of money that he or she would have had but for the defendant's wrongdoing. The law imposes this additional burden on a defendant in order that compensation may be fully made. This remedial incident does not depend on contract, either on a contract between the plaintiff and the defendant, or on a contract between the plaintiff and someone else, with which defendant's wrongdoing has interfered. If A is indebted to B on a note, bearing interest at an agreed rate, and A does not pay, B may have judgment for the unpaid principal and interest accrued to date of judgment. That is contract interest, not "prejudgment interest" as that term is usually understood. So, as here, if A has agreed to employ B for certain compensation, including setting aside certain sums, which sums bear interest at an agreed rate, and C's tort renders B unable to work, we think the interest that the sums set aside (or that would have been set aside) would have earned is not "interest prior to judgment" within the meaning of the Tort Claims Act. As a matter of damages theory, the award of lost pension earnings serves the same purpose as the lost pension contributions and even the lost wages.

■ The only difficulty we have with this element of damages is the period for which it was awarded. The District Court found that Manko would have retired on his 70th birthday, January 21, 1982, but it awarded lost pension earnings from the time of his illness through the year 1985. 636 F.Supp. at 1447–49 & nn. 30–38. This would be appropriate if the Court had made factual findings that Manko would not have been able to draw on his pension plan until the end of 1985, and that the trustee would have been obligated to continue to manage the fund for his benefit from the date of retirement through 1985. But there are no such findings, nor have we found anything in the record that sheds light on these questions. Thus there is no factual predicate for the award of lost pension earnings, as damages, from January 21, 1982 through 1985.

This requires that we remand to the District Court for a limited factual inquiry. The award of lost pension earnings after January 21, 1982, can stand only if, as a matter of fact, Manko would not have withdrawn his funds from the pension plan, and the trustee would have been obliged by contract to continue to manage them for Manko's benefit, despite the fact that Manko would have retired. Absent some clear provision in the terms of the pension plan, those propositions may be highly speculative. If the Court on remand makes such findings, and they are not clearly erroneous, the award will stand. If, however, it finds that Manko would have drawn on the pension fund or would not have been entitled to benefit from the trustee's management of the plan after retiring, then the award must be recalculated to grant damages for lost pension earnings only for the period during which they would have been earned.

### D.

■ Manko also raises a damages issue on cross-appeal. The trial of this case ended on December 14, 1984. Judgment for Manko was entered on June 5, 1986. Manko argues that interest on the judgment should, in fairness, run from the end of the trial or, perhaps, from some other date before the entry of judgment. He should not be penalized, he argues, for the lapse of more than 18 months between the close of the evidence and the entry of judgment. Judgment could be entered *nunc pro tunc* as of whatever earlier date would be fair, it is argued, and interest accruing from that earlier date would not be "prejudgment interest" ruled out by the Tort Claims Act.

The District Court refused this request, and we affirm. The phrase *nunc pro tunc*

cannot be so easily used to evade the Tort Claims Act, which, as a waiver of sovereign immunity, must be strictly construed in favor of the United States. The interest that the plaintiff would gain by this device would be "prejudgment" in the most basic sense. The delay in decision is a regrettable but normal incident of litigation in overcrowded courts. The delay was longer than normal, but the case is larger than normal, too, and we can understand the District Court's desire to proceed with care —a desire which, incidentally, has produced an opinion that has greatly facilitated our work as a reviewing court.

### III.

■ Mrs. Manko cross-appeals from the District Court's refusal to permit her to join the lawsuit in order to seek recovery for her damages for loss of consortium because of Mr. Manko's illness. When she first sought to join the action, on March 13, 1981, she had not yet filed an administrative claim with the appropriate federal agency, and the Court properly denied her motion under 28 U.S.C. § 2675(a). *Manko v. United States*, No. 79–1011–CV–W–6 (W.D.Mo. March 25, 1981).[5] She then filed an administrative claim on March 27, 1981, which was denied on April 30, 1981, and returned to court. Her husband moved for leave to file an amended complaint naming her as a co-plaintiff and adding her consortium claim. This was denied because the Court found her claim barred by 28 U.S.C. § 2401(b)[6] for failure to file the administrative claim within two years of the time it accrued.[7] *Manko v. United States*, No. 79–1011–CV–W–6 (W.D.Mo. Sept. 18, 1981).

Since Mrs. Manko did in fact file an administrative claim, she satisfied the requirement of 28 U.S.C. § 2675(a); but the

**5.** This aspect of the case was handled by the Hon. Howard F. Sachs, United States District Judge for the Western District of Missouri.

**6.** 28 U.S.C. § 2401(b) provides in part:
A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing ... of notice of final denial of the claim....

**7.** The government questions our appellate jurisdiction over Mrs. Manko's cross-appeal of the latter order. It argues that the only order being appealed is the denial of Louis Manko's Amended Motion for Leave to File First Amended Complaint, which his wife did not join. Mrs. Manko lacks "standing" to appeal the order because, the government argues, she did not file it, and she never sought to intervene after the motion was denied.
We disagree. Manko's motion under Fed.R. Civ.P. 15 for leave to file the Amended Complaint naming Mrs. Manko as a plaintiff was an

question remains whether she complied with the limitations period of 28 U.S.C. § 2401(b). To win this appeal, she must at least demonstrate that a genuine fact issue exists with respect to whether she complied with that statute. We hold that Mrs. Manko cannot prevail on this issue, so we affirm the judgment as it relates to her.

Unless a claim is filed within the two-year limitations period of § 2401(b), there is no right to proceed against the government in a Federal Tort Claims action. See *Wollman v. Gross*, 637 F.2d 544 (8th Cir. 1980), *cert. denied*, 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981). That time begins to run on the accrual of the claim, and, according to *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), a claim accrues when the plaintiff knows (or reasonably should know) she has been injured and what the cause of her injury is. Ordinarily these questions are for the fact-finder to determine, but when the plaintiff's allegations, accepted as true, establish that the claim accrued more than two years before it was filed, there is no triable issue of fact, and the complaint should be dismissed (or, what amounts to the same thing in this case, leave to amend the complaint to add the claim should be denied).

The proposed amended complaint alleges that Louis Manko received a swine-flu shot on October 20, 1976, which caused him to develop Guillain-Barré Syndrome and resulted in his and Mrs. Manko's damages. It contains no allegation that Mrs. Manko discovered the cause or fact of her loss of consortium at any time after October 20, 1976. Designated Record (D.R.) at 86–93. Her administrative claim, attached as an exhibit to the supporting brief, shows on its face that it was filed on March 27, 1981. D.R. 105.

Despite this failure to plead any facts to show that the claim was timely, the District Court (correctly) considered all of the arguments presented by the Mankos in support of the amended complaint. Most of these arguments are pressed here; [8] they are (1) Louis Manko's timely administrative-claim form informed the government that he is married, and this was sufficient to satisfy § 2401(b) with respect to Mrs. Manko's purely derivative claim for loss of consortium; (2) since no action was taken on Louis Manko's claim, it would have been futile for Mrs. Manko to file a claim on her derivative action, so the requirement should be excused; (3) Mrs. Manko's claim should relate back to the date of Louis Manko's claim; and (4) Mrs. Manko's claim did not accrue until sometime in 1981, when she learned that her husband's impotency would be permanent. We will discuss each of these arguments.

In considering § 2401(b), we keep in mind the words of the Supreme Court:

> Section 2401(b) ... is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe it so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims....
>
> We should also have in mind that the [Federal Tort Claims] Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we should not take it upon ourselves to extend the waiver beyond that which Congress intended.... Neither, however, should we assume the authority to narrow the waiver that Congress intended....

*United States v. Kubrick*, 444 U.S. at 117–18, 100 S.Ct. at 357 (citations omitted).

acceptable route for joining her as a plaintiff; she could also have filed a motion to intervene under Fed.R.Civ.P. 24. The fact that Mrs. Manko was not a party to the motion does not mean that she has no "standing" to appeal. First, Mrs. Manko had no right to file a motion to amend under Fed.R.Civ.P. 15; that Rule applies only to parties, and she was not a party when the motion was filed. Second, her name appeared on the proposed amended complaint as a plaintiff, so she was in a sense before the Court. Finally,

as for her "standing," the Court's denial of the motion directly injured her in that it prevented her from pursuing her claim for damages. She has every right to complain to us that the Court erred.

8. Mrs. Manko has abandoned her argument that the six-year limitations period for breach of warranty, 28 U.S.C. § 2401(a), rather than § 2401(b)'s two-year tort period, governs her claim.

■ The first contention, that Louis Manko's administrative claim served as adequate notice of Mrs. Manko's claim, is unacceptable. His claim did not notify the government that Mrs. Manko was also a claimant; nor did it state the amount of any claim she might have. It did, as Mrs. Manko argues, show that she is his wife, and the description of his injury may have suggested that she had suffered a loss of consortium. But this did not satisfy the purpose of the statute, "which is to require the reasonably diligent presentation of tort claims against the Government." *United States v. Kubrick*, 444 U.S. at 123, 100 S.Ct. at 360 (footnote omitted). The legislative history of the 1966 amendments to the Federal Tort Claims Act, of which § 2401(b) was part, shows that Congress intended to create an administrative-claims system by which the agency involved could resolve specific claims for specific amounts of money. See S.Rep. No. 1327, 89th Cong., 2d Sess., *reprinted in* 1966 U.S. Code Cong. & Admin.News 2515. See also 28 U.S.C. § 2675(a)-(b). With respect to Mrs. Manko's claim, Louis Manko's claim form did no more than give the government notice that she could have a claim for some undetermined sum which she might present. This is insufficient under the Act. See *Rucker v. United States Department of Labor*, 798 F.2d 891, 893–94 & n. 5 (6th Cir.1986); *Murray v. United States*, 604 F.Supp. 444, 446 (E.D.Pa.1985).

■ The second contention, that Mrs. Manko should be excused from having to file an administrative claim because it would have been futile, is equally unavailing. Neither § 2401(b) nor § 2675(a) contains an exception for futile claims, and it would disrupt Congress's administrative-claims procedure for a court to carve out such an exception. See *Susanin v. United States*, 570 F.Supp. 25, 26 (W.D.Pa.1983).

■ Mrs. Manko's third argument is that her administrative claim should relate back to the date of her husband's, which was filed within two years of the onset of his illness. She relies on Fed.R.Civ.P. 15(c) and on the decisions in *Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508 (6th Cir.1974), *Avila v. INS*, 731 F.2d 616 (9th Cir.1984), *Williams v. United States*,

405 F.2d 234 (5th Cir.1968), and *Ottem by Ottem v. United States*, 594 F.Supp. 283 (D.Minn.1984).

We note first that Fed.R.Civ.P. 15(c) does not apply to this issue. Rule 15(c) applies only to relation back of amendments to pleadings in ordinary lawsuits; the current issue does not arise in such a setting. We also reject Mrs. Manko's argument that Rule 15(c) applies because her claim arises in the context of her husband's lawsuit. Unless she complies with § 2401(b), she is barred from recovering against the government; she cannot avoid that requirement simply by joining a pending case. We disagree with plaintiff's reliance on *Williams v. United States, supra*. That case was decided under the law as it existed before the 1966 amendments. The prior law required presentation of an administrative claim as a prerequisite to a court action only if the claim was for less than $2,500; otherwise, § 2401 only imposed a two-year limitations period for filing suit. *Williams* apparently involved a claim in excess of $2,500, so there was no administrative-exhaustion requirement in that case. The question was only whether an amendment of the complaint would relate back under Rule 15(c) to within two years of the accrual of the cause of action. Thus that decision does not speak to the issue before us.

Nor does *Ottem by Ottem v. United States, supra*, support Mrs. Manko's relation-back argument. That decision relied on a theory of substantial compliance with the claim requirement, not on relation back. Plaintiffs' lawyer there had intended to file a claim for both the injured claimant and his wife, who alleged loss of consortium. After realizing he had not filed a separate claim for the wife, the lawyer, within the statutory time, spoke with the government's lawyer and was assured that her claim was sufficiently presented. They spoke at least five times about her claim, and, the Court found, "[t]he government apparently investigated, processed, and denied the claim without once mentioning any defect or omission." 594 F.Supp. at 287. Thus the administrative-claim requirement had been substantially satisfied with respect to the wife's loss-of-consortium claim. There is no similar argument in our case.

The final two decisions on which Mrs. Manko relies, *Executive Jet Aviation* and *Avila,* do provide a relation-back doctrine for administrative claims under the Tort Claims Act. *Executive Jet Aviation* involved the claim of an insurer who had, under state law, been subrogated to the claim of the injured party, but who had not filed an administrative-claim form. The issue there was whether the insurer, who was the real party in interest, could be shown as a claimant on an amended claim form. As the Court noted, allowing the amendment in no way impaired the government's ability to evaluate the claim or defend the lawsuit: the value of the claim and the defenses against it remained the same; only the identity of the claimant changed. See 507 F.2d at 514–17. In fact, the need to add the insurer to the amended form arose only because the government had answered in the lawsuit, within the two-year limitations period, that the injured claimants were not the real parties in interest. *Id.* at 516. Permitting the amendment to relate back in that case did not frustrate the purpose of § 2401(b) in any way.

In this case, even if we were to construe Mrs. Manko's separate administrative claim as an amendment to her husband's (which it is not), it would not fall within the narrow rule of *Executive Jet Aviation.* Her claim seeks to increase the amount of the government's liability over the amount stated in her husband's claim. It does not seek simply to substitute the real party in interest. In *Executive Jet Aviation,* allowing the amendment to relate back did not alter the basic calculation confronting the government in deciding whether to settle. Mrs. Manko's, however, would: it would substantially increase the amount of the government's exposure, and this presumably would change the way it would approach a possible settlement. This, we think, would frustrate Congress's intent in requiring presentation of administrative claims within two years.

The last case, *Avila,* is in point for Mrs. Manko's argument. There the Court permitted a father to amend his son's claim, after the two years had run, to add his own

claim for damages arising out of his son's claim. The Court reasoned, "[The son's] claim, and the accompanying letter, identified Jesus as Daniel's father and explained Daniel's disability. The nature of Jesus's damages was such that the government would reasonably expect to occur from its wrongful deportation of a mentally impaired citizen." 731 F.2d at 620.

Setting aside the fact that Mrs. Manko filed a new claim rather than an amendment to her husband's, if we followed *Avila,* it would lead to the result Mrs. Manko seeks. The government does not attempt to distinguish *Avila* on its facts; nor do we think it could do so successfully. Indeed, Mrs. Manko's loss-of-consortium claim is, if anything, even more likely to have occurred in conjunction with her husband's claim than Jesus's claim was with respect to his son's in *Avila.* Jesus Avila's claim was for the expenses necessary in his search for his son after the deportation.

But we decline to follow *Avila.* We disagree with its reasoning. The Court reasoned by way of analogy to Fed.R.Civ.P. 15(c) and in reliance on two decisions, *Leachman v. Beech Aircraft Corp.,* 694 F.2d 1301, 1308–10 (D.C.Cir.1983), and *Williams v. United States, supra. Leachman* was a private damages action that raised a relation-back issue under Rule 15(c), but did not involve a tort-claims action or § 2401(b). *Williams* we have already discussed; it was decided before the 1966 amendments to the Federal Tort Claims Act and involved only an issue under Rule 15(c). Therefore it is not good authority on the issue of relation back under § 2401(b). We believe the result in *Avila* is at odds with the congressional purpose underlying § 2401(b) because, as we have explained, amendments which add new claims or increase the amount of damages sought change the government's settlement calculus. Section 2401(b) permits such changes for up to two years after the claim accrues, but, after that time, we think that Congress intended all claims already submitted to become final in their material respects. Allowing material changes in claims after that period would severely disrupt the settlement process. Our conclusion also accords with the fact

that § 2401(b) is a condition of waiver of the sovereign immunity of the United States, and we must strictly construe the statute to avoid extending the waiver.

Mrs. Manko's final argument is that her claim did not accrue under § 2401(b) until within two years of the time she filed her claim form. *United States v. Kubrick* holds that a claim accrues for purposes of this statute when the claimant knows (or reasonably should know) both that she has been injured and the cause of the injury. Mrs. Manko does not argue that she was unaware of the fact or cause of her loss of consortium until within two years of the time she filed her claim; instead she contends that she believed her loss of consortium was only a temporary injury, and that it would end as soon as her husband completed his recovery. Her claim accrued, she argues, only when she discovered, some years later, that her loss of consortium would be permanent because her husband was permanently, organically impotent. To hold her claim barred, she asserts, would penalize her for exercising restraint rather than being aggressive in pursuing litigation.

We cannot accept these arguments. Mrs. Manko in effect concedes that she knew of her injury and its cause at the time of her husband's hospitalization in 1977. We are constrained to hold that her claim accrued then, and that it was forever barred by the time she filed her claim in 1981. The language of § 2401(b) and the logic of *United States v. Kubrick* simply do not admit the distinction between temporary and permanent injury that Mrs. Manko presses. See *Gustavson v. United States*, 655 F.2d 1034 (10th Cir.1981); *Robbins v. United States*, 624 F.2d 971 (10th Cir.1980). The cases on which Mrs. Manko relies to support the distinction either do not apply in the present context, see *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82 (8th Cir.1966); *Williams v. Borden, Inc.*, 637 F.2d 731 (10th Cir.1980), or do not stand for the proposition, see *Reilly v. United States*, 513 F.2d 147 (8th Cir.1975). We can appreciate Mrs. Manko's expressed desire to avoid litigation over more or less short-lived injuries and sue only for more serious, permanent wrongs, but statutes of limitations, which are often harsh in their application, are not tolled by a party's good intentions.

The District Court did not err in declining to entertain Mrs. Manko's claim.

## IV.

To summarize: the judgment will be affirmed in all respects, except that the cause will be remanded to the District Court for the limited purpose of making findings, the nature of which we have described in Part II.C. of this opinion, with respect to the date on which damages for lost earnings on plaintiff's pension plan should cease to run.

It is so ordered.